UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:11-cr-00374-FDW

| | | |
|---|---|---|
| UNITED STATES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| MICHELLE V. MALLARD, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

THIS MATTER is before the Court on Defendant's "Pro Se Motion to Withdraw Plea of Guilty." (Doc. No. 179). Since filing that motion, Defendant has retained counsel. (Doc. No. 187). The Court conducted a hearing on this motion on December 14, 2014, and heard evidence presented by both parties. Defendant also testified at that hearing. For the reasons that follow, the Court DENIES Defendant's motion.

## I. Findings of Fact

1. Defendant pled not guilty to the original Bill of Indictment on November 23, 2011; the First Superseding Bill of Indictment on April 26, 2012; and the Second Superseding Bill of Indictment on October 3, 2012. Defendant was charged with one count of Mortgage Fraud Conspiracy, one count of Money Laundering Conspiracy, and one count of Wire Fraud Embezzlement Scheme. Defendant elected to plead not guilty before trial and declined to enter plea agreements offered by the government.

2. Defendant Michelle V. Mallard, a/k/a Michelle Crawford, is a well-educated college and business school graduate and previously licensed attorney, licensed real estate agent, and licensed notary public.

1

3. After granting several motions for continuances made by Defendant, the Court eventually called this matter for trial on July 8, 2013. Following jury selection that day, the Court promptly proceeded with opening statements and the presentation of evidence by the Government.

4. Trial continued a second day, and on July 9, 2013, the Court and jury continued to hear evidence presented by the Government. Later that night, Defendant's counsel sent written correspondence to the Court's clerk advising the Court that his client – Defendant – intended to plead guilty to the three counts against her from the Second Superseding Indictment. Defense counsel also had a conversation with counsel for the Government advising them of Defendant's intention to plead guilty.

5. Defendant was previously represented by Mr. Rick Winiker, an experienced local defense attorney who also has prior experience as an Assistant United States Attorney. Mr. Winiker represented Defendant from the time she was initially indicted, through pre-trial proceedings, trial, her mid-trial change of plea, and until her sentencing hearing when she first sought to withdraw her guilty plea. Before Mr. Winiker, Defendant was also represented pre-indictment by Lisa Costner and Jake Sussman, both experienced attorneys.

6. Among other witnesses, including an expert witness, several co-conspirators testified at trial as to the facts of the conspiracy and specifically as to Defendant's knowledge and involvement in the conspiracy.

7. Jimmy Hitchcock testified that he conspired to commit mortgage fraud with Lisa Staton, Walter Staton, Mitzi Jackson, and Defendant, among others. He pled guilty to the charges against him. He testified that his role in the conspiracy was to be either a home buyer or a promoter, and he would create bogus documents used for loan applications, set lawyers up with people, and match people with builders. In short, he said he helped bring other people together to commit mortgage fraud. Mr. Hitchcock said that Defendant was the lawyer that helped transfer the money to various bank accounts, sometimes for sham corporations, and closed the transactions. Mr. Hitchcock specifically testified that Defendant handled a closing at 1009 Berwick Court, a home owned by Mr. Hitchcock. In that transaction, Mr. Hitchcock obtained a buyer named Michael Marshall. According to the HUD, both Mr. Marshall as the buyer and Mr. Hitchcock as the seller were supposed to bring money to the closing. Ms. Staton closed the loan, and Defendant was not present at the closing, although she is identified as the closing attorney. Mr. Hitchcock testified that despite the fact that the disbursement sheet said that there were copies of these checks in the Defendant's file, neither he nor the buyer brought any money to the closing, but instead both people delivered checks to Defendant's office two days after the closing took place. Mr. Hitchcock additionally testified that Defendant failed to pay off his mortgage as part of the closing transaction. Upon learning that his mortgage had not been paid, Mr. Hitchcock confronted Defendant. Defendant denied not paying the mortgage but subsequently admitted to Mr. Hitchcock that she had not paid the mortgage. Mr. Hitchcock testified to another closing transaction that occurred approximately two months after the Berwick closing involving the same people

including, among others, the Statons, Mr. Marshall, and Defendant for a property located at 5422 Piper Glen. Mr. Hitchcock testified that Mr. Marshall was to buy this property and there was going to be a "spread," meaning a difference between the actual price and the inflated price of the property. In exchange for a payment, an appraiser had agreed to inflate the property value so that the purchaser could obtain a larger loan amount. The money distributed as a result of the "spread" would go to various companies, some of whom did not appear on the HUD statement. Mr. Hitchcock explained that the money he received from the transaction for "marketing fees" and "debt paid at closing" would be used by his companies to be distributed back to the buyers – mainly Mr. Marshall. Mr. Hitchcock testified that Defendant personally delivered him his check for the "debt paid at closing" owed to Phoenix Resources Financial Group. While Mr. Hitchcock was present at Defendant's office to get this check, he again inquired as to whether the mortgage from his prior closing for the Berwick property had been paid. According to Mr. Hitchcock, Defendant stated she had paid the mortgage and explained that it was not originally paid because she had used some of the money in her other businesses. Mr. Hitchcock testified that he closed additional fraudulent loans involving Ms. Staton with Defendant. Mr. Hitchcock testified that he would make copies of fake checks to make it look like the closing attorney had a copy on file for a check that was supposed to have been cashed. At some point during the conspiracy, Defendant could no longer close loans but instead arranged for others to close loans involving Ms. Staton and Mr. Hitchcock. Defendant's law firm closed a loan for 1615 Lookout Circle. Mr. Hitchcock

understood that because Ms. Staton was involved with the loan that Defendant was actually closing the loan.

8. Troy Smith also testified at Defendant's trial. Prior to trial, Mr. Smith pled guilty to two counts of conspiracy to commit mortgage fraud and two counts of money laundering. Mr. Smith testified that he was the closing attorney in about six or seven fraudulent real estate transactions involving, among others, Jimmy Hitchcock, Lisa Staton, and Michael Marshall. Mr. Smith testified that as the closing attorney, he did not receive any kickbacks from closing proceeds for fraudulent closings. Mr. Smith received closing fees, and he testified that he charged and received higher closing fees for these fraudulent closings than he normally charged for legitimate closings. Mr. Smith testified that he knew that the closings he conducted involving Mr. Hitchcock and Mr. Marshall involved inflated appraisals; copies of checks that appeared to have been deposited in Mr. Smith's account, which never actually were deposited; and fraudulent invoices indicating that someone was owed money at closing for work performed for the seller, when the work was never actually performed. Mr. Smith testified that he closed transactions knowing that the debts reflected on the HUD for Phoenix Resources were not legitimate debts. Mr. Smith also testified that, as part of the closing transaction, he received fraudulent documents from Ms. Staton. Mr. Smith testified that he had no dealings with Defendant during the course of the mortgage fraud conspiracy involving Mr. Hitchcock, Ms. Staton, and others.

9. Lisa Staton also testified at trial. Ms. Staton worked as a processor of mortgage loans during the course of the conspiracy. Like the other fact witnesses, Ms. Staton pled guilty

to conspiracy to commit mortgage fraud. She testified that she facilitated the creation of false documents, faxed these documents to mortgage companies, and used the fraudulent documents to obtain loans for real estate purchasers. She created a shell company that received funding and distributed the proceeds to various other shell companies. Ms. Staton testified that she used Defendant and Troy Smith to close these fraudulent loans. Ms. Staton originally met Defendant at a networking event, and the two subsequently became "very close" friends. Ms. Staton testified she completed over fifty different real estate closing transactions with Defendant and that not all of these transactions were fraudulent. During the course of their business relationship, Ms. Staton learned that Defendant had "issues" with her trust account after a buyer informed Ms. Staton that the buyer's mortgage had not been paid off at closing. Defendant explained to Ms. Staton that the failure to pay the mortgage was a clerical error. Then another buyer, someone from one of the "illegitimate deals we had done," stated that his loan also had not been paid. Ms. Staton called Defendant, who stated she would take care of it and pay the late fees. Ms. Staton also learned that the North Carolina State Bar had some involvement with Defendant's trust account, which Ms. Staton understood resulted in Defendant losing her license to practice law. Nevertheless, Ms. Staton continued to conduct mortgage transactions at Defendant's law office. Ms. Staton testified that she would deal with Defendant but that the transactions would go through Daniell Jones' trust account. Ms. Jones was another attorney that Defendant had hired to work in her office. Ms. Staton testified that even though Ms. Jones was the closing attorney, Ms. Staton would still contact Defendant about loan closings, and Ms. Staton would then fax over the

request to Defendant.  After the mortgage company funded the loan, Defendant would pull the documents and close the loan.  Ms. Staton stated that she never dealt with Ms. Jones at all.  Ms. Staton testified, "I only did business with Michelle.  Any contact that I had was with Michelle, so – I mean to me it would be she is the only one handling everything."  Ms. Staton's testimony indicated that she still used Defendant to close loans even after the North Carolina State Bar had revoked her license to practice law.

10. Ms. Staton also testified regarding specific fraudulent loan closings involving Defendant. Ms. Staton stated that she worked with Mr. Marshall on a home purchase involving Defendant as the closing attorney.  Ms. Staton testified that at the time, she was under the assumption that it was a legitimate loan, but she subsequently found out about two months later that it was not legitimate when the same buyer—Mr. Marshall—came back to close another loan.  Mr. Marshall stated on both loans that each property was to be his primary residence, which would require the buyer to live in the property for at least a year before selling.  Ms. Staton understood that under "mortgage company standards," you are not allowed to own two primary properties.  Ms. Staton nonetheless worked to close the loan because her company would make money from the proceeds of the loan. Defendant closed this loan for Mr. Marshall's second "primary residence" purchase only a few months after Defendant had closed the loan for another property he identified as his "primary residence."  Although Ms. Staton knew about Defendant's problems with her trust account, Defendant told Ms. Staton that Defendant needed the loan closing business, so Ms. Staton resumed doing business with Defendant.  As part of this loan closing, Mr. Hitchcock showed Ms. Staton how to obtain fraudulent proceeds by using a shell

company, which Ms. Staton named "NP Home Improvement." Ms. Staton testified that Defendant prepared the HUD forms that identified payouts to these shell companies. Ms. Staton testified that she had informed Defendant when she created the shell company "NP Home Improvement" and that she explained to Defendant that Defendant had to hold checks in escrow at closing because the money owed from NP Home Improvement could not be covered. The address for NP Home Improvements was Ms. Staton's home address, a place Defendant had visited a couple of times. In regards to another transaction, Ms. Staton also testified that she wanted to purchase a home that she planned to live in, but needed someone else's credit scores to purchase the property. Ms. Staton testified she was the mortgage broker on this deal, even though she knew that a mortgage broker cannot broker a deal for their own purchases. Ms. Staton identified the borrower on this loan as "Lila Jones," who is the mother of one of Ms. Staton's employees named Tyree Jones. Defendant had met Ms. Jones on numerous occasions. Ms. Staton prepared false invoices and submitted them via the builder to Defendant's law office in order to receive compensation from the loan proceeds. Ms. Staton testified that although cash was due from the borrower at closing, Ms. Jones did not deliver any cash or check. Instead, Ms. Staton prepared a fraudulent cashier's check made up for the earnest money deposit to provide to the closing attorney so that it would appear Ms. Jones had the money at closing. Once the deal closed, Ms. Staton would then cover the cost of the earnest money through NP Home Improvement. As part of this transaction, Ms. Staton delivered a check to Defendant via the builder and asked Defendant to hold the check until the loan closed because the money from NP Home Improvement would cover the

cost after closing.  Ms. Staton testified that Defendant knew she had to hold the check, and she did in fact hold the check until the loan closed.  After closing the transaction for Lookout Circle, both Ms. Staton and Defendant went to the bank together to get the money to cover the check.  Ms. Staton testified on cross-examination that Defendant withdrew the money and then Ms. Staton immediately deposited the money.  Ms. Staton testified that she relied on Defendant to make the kickback payments from the loan proceeds to NP Home Improvements.  Ms. Staton also testified that Defendant knew that NP Home Improvements was in fact a company owned by Ms. Staton.  Ms. Staton also testified that she provided funds that should have been exchanged at closing a day after the closing actually occurred.  Ms. Staton also testified that Defendant notarized Lila Jones' signature on documents, when in fact Lila Jones never appeared before Defendant to sign the document.

11. Ms. Staton testified that although she was aware that she could receive a reduced sentence for her cooperation with the Government, she "did not want [Defendant] to get in trouble for this."  Although defense counsel cross-examined Ms. Staton on some of the fraudulent transactions and her possible motive to testify in order to receive a more favorable sentence, the Court recessed for the day prior to defense counsel's completion of the cross-examination of Ms. Staton on July 9, 2013.

12. On July 10, 2013, before the Government resumed with the cross-examination of Ms. Staton, Defendant indicated that she wished to change her plea and tender a plea of guilty to each of the Counts with which she was charged.  The Court conducted a Rule 11 hearing to accept Defendant's change of plea.

13. The Government expended significant resources in preparing for Defendant Mallard's trial and conducting a significant portion of it.

14. The Court further finds that all trial witnesses were credible during their testimony. The witnesses appeared to testify truthfully and did not hesitate when thoroughly cross-examined by Mr. Winiker.

15. Although magistrate judges frequently conduct plea hearings in this district, because the jury had already been empanelled and because a significant portion of trial had already taken place, the undersigned conducted the Rule 11 plea hearing. At the plea hearing, Defendant stated that she understood that she was under oath and required to give truthful answers to the questions propounded to her. During the plea hearing, she stated that she understood the formal written charges against her. She stated that she had an opportunity to fully discuss the charges with her counsel. She stated that Mr. Winiker had answered all of her questions regarding the plea. When asked "Has anyone attempted in any way to force you to plead guilty or otherwise threatened you," she responded without hesitation, "No." (Doc. No. 185, p. 5). The Court explained each of the elements of the counts in detail. Defendant consistently stated that she understood.

16. The Court initially asked Defendant to state in her own words the factual basis for her plea. Her attorney objected, and after some discussion, the Court requested the Government to briefly state a factual basis for the plea. In doing so the Court also specifically noted, "we have a day and a half of evidence, there's already a factual basis out there." (Doc. No. 185, p. 15). The Government stated in open court a factual basis for the plea. The Court then asked Defendant whether she disagreed with anything in the

factual basis. Defense counsel requested a brief recess to discuss this with his client, and upon resuming the plea hearing, Mr. Winiker specifically argued there was "some differences of opinion regarding the February 2007 closing" on the Andiron Drive property. (Doc. No. 185, p. 26). Defense counsel also noted "there were statements made by the witness, Lisa Staton, and we wouldn't adopt all of those statements made by the witness as far as agreeing to those." (Doc. No. 185, p. 26). Mr. Winiker added, "I think she'll agree with me in response to the Court – acknowledges that she is guilty of the offenses and willfully joined the conspiracy knowing what was occurring during the conspiracy . . . two conspiracies . . . ." (Doc. No. 185, p. 29).

17. Defendant agreed that there was sufficient evidence presented or proffered by the government so that she did not dispute the essential elements of the three offenses.

18. Defendant then unequivocally pled guilty to all three counts.

19. On the day of her sentencing hearing, October 28, 2014 – fifteen months after she pled guilty – Defendant sought to withdraw her guilty plea. The Court continued the sentencing hearing until December 15, 2014.

20. Defendant subsequently filed a written Pro Se Motion to Withdraw Her Plea on December 4, 2014. Despite admitting under oath that she was guilty as to all three counts, in both her oral and pro se written motion to withdraw her plea, she summarily asserted that she is innocent.

21. Defendant has not given a clear and credible reason as to why she pled guilty if she in fact believes she was innocent. At the hearing on the instant motion, Defendant admitted that she told the truth at her plea hearing, and that she understood the essential elements

of the three counts.  She stated that she was being truthful when she stated that she was satisfied with Mr. Winiker's representation of her.

22. Defendant stated that she pled guilty after a co-conspirator testified falsely against her. She also stated that she felt "berated" by her attorney, Mr. Winiker, and felt he was not properly defending her against the charges.  But she also stated that she thought she was guilty, at least under the description of the crimes as they were explained to her. However, she later stated that she wanted to withdraw her plea because she maintained her innocence, even if she didn't know how to prove it.

23. At the hearing on the instant motion, Defendant exhibited an intimate knowledge of the provisions of Rule 11.  Further, email correspondence between Defendant and Rick Winiker shows that she specifically intended to preserve her right to withdraw her plea at the sentencing hearing.  In fact, she did not sign a plea agreement with the government that took away her right to withdraw her plea.

24. At the hearing on the instant motion, Defendant gave a skeptically ambiguous and veiled testimony which was irreconcilable with evidence the Court heard during her trial.

25. The presentence report describes in detail the perpetuation of the mortgage fraud schemes that took place in Waxhaw and Charlotte, North Carolina, along with each co-conspirators involvement in furthering the fraud.  In short, the co-conspirators would arrange to have homes purchased at an inflated price, obtain loans from lenders on the inflated prices, and funnel the kickbacks into sham corporations which they themselves owed.  The loan documents would be manipulated so that the money sent to the corporation appeared to be a payment for work the corporation had done on the home.

26. The presentence report explains the fraudulent mortgage obtained to finance the purchase of 10619 Andiron Drive in Charlotte.  According to the report and testimony at trial, the home was purchased by a straw-buyer, Lila Jones.  Her loan application falsified her income and was supported by bogus tax returns.  The closing was arranged through Defendant's firm, with a $73,000 kickback going to a corporation owned by Walter and Lisa Staton called NP Home Improvements.

27. At the withdrawal of plea hearing, Defendant denied involvement in the above transaction.  She stated that a different attorney (Daniell Jones) processed the closing and that other staff did the actual paperwork.  However, during trial, the evidence showed that Defendant was personally involved in this transaction.  The government showed that Defendant prepared the general warranty deed for the sale and that she was the contact for the bank on the transaction.

28. Because the buyer, Lila Jones, did not have cash for the down payment, Defendant and Lisa Staton fraudulently facilitated to provide the cash after the closing, when it was supposed to be provided before.  The kickback money was thereafter used to reimburse the trust account and Defendant.

29. According to the presentence report and testimony at trial, a similar fraud took place involving 1615 Lookout Circle in Waxhaw, North Carolina.  Lila Jones was against listed as the buyer of the house.  The closing was arranged through Defendant's firm, with a $50,000 kickback funneled to NP Home Improvements.  A few months after the purchase, the Statons put the property in Donald Pittman's name and earned another kickback of over $300,000.

30. At the hearing on the instant motion, Defendant testified that she had little to no involvement in the Lookout Circle closing. She then admitted that she could have answered questions about the closing or helped fax documents to appropriate parties. The government presented evidence to show that the closing package for the Lookout Circle closing was sent to Defendant's personal email, that she was listed as the contact for the bank, and that she signed and notarized the documents regarding this transaction. Either she falsely notarized the closing documents or she lied about her involvement while under oath, both of which constitute fraud.

31. According to the presentence report and testimony at trial, a similar fraud took place involving 5433 Piper Glen Drive in Charlotte, North Carolina. The transaction resulted in a $79,000 kickback to the conspiracy.

32. At the withdrawal of plea hearing, Defendant was very elusive as to how involved she was at her law firm during the time of the fraudulent transactions. During this time, Defendant's father was battling severe throat cancer. At the plea hearing she testified that she believed he was being mistreated by his caregivers in Alabama, so she brought him to live with her in Charlotte. Because of this arrangement, she started her own law firm, as she could not travel to Winston-Salem to work every day. On cross, she stated that her father came to live with her in January or February of 2005. She stated that he then went to live with Defendant's sister, but then returned to Defendant's care in March of 2006. He died in December of 2006.

33. Defendant mentioned several times at the withdrawal of plea hearing that she was consistently absent from the firm because she was caring for her father, who was in and

out of the hospital. Defendant testified that she worked "closely" at her law firm in "fall/winter 2005 to 2006." She then testified that "she started to take a step back at [her] law firm and not really start working closely" in "the first month or two" that she started it. She stated that from the time she started the law firm until December when her father passed away, she was in the firm "rarely." She would come in to sign paper work, but the paralegals would do the HUDs, the processing, and the closings.

34. To say that Defendant was unclear when testifying about her involvement in any particular closing processed by her firm would be a vast understatement. In regards to the specific fraudulent transactions mentioned in the presentence report, Defendant's answers varied when questioned about her presence at or involvement with any of those deals. She would testify that she was present, that she could not remember if she was present, and then later state that she was not present. Whether or not she was present at a specific closing becomes irrelevant when she admits to signing and notarizing closing documents even when she was not present at the closings.

35. During the hearing, Defendant admitted that her method of processing the loans was "wrong and definitely negligent." Defendant stated that she would not question the paperwork the Statons (or any loan processor) would send to her. She processed everything she received at face value and sent the paperwork directly to the lender, who would approve the payout. She never questioned the legitimacy of the documents.

36. Defendant admitted at the withdrawal of plea hearing that she failed to keep track of the money in her client trust account. She blamed this error on incompetent staff and on the distraction of caring for her father.

37. Defendant's trust account became so short on funds that she was unable to pay out the mortgage for two clients who had hired her firm to process a closing. This mortgage was ultimately paid off by Defendant's malpractice insurance. As a result, the North Carolina State Bar obtained a preliminary injunction against her, which enjoined her from "directing any employee or agent to withdraw funds from and/or draw a check on any account in which a client or fiduciary funds have been deposited until permitted by subsequent orders of the Court." Defendant signed a consent order of this preliminary injunction in December 2006.

38. During the hearing, Defendant admitted to lying to her clients when they called and asked whether their mortgages had been paid off.

39. Since she no longer had access to her trust account, Defendant hired Q. Daniell Jones to do the remainder of the closings that Defendant's firm was hired to do. However, Defendant testified that she did not think this violated the consent order and viewed Daniell as more of an independent contractor than one of her employees.

40. Defendant testified that she did not know Daniell Jones' level of experience with closings when she asked Ms. Jones to take over the closings for her. She knew that Ms. Jones had not actually closed a loan on her own before. Defendant admitted to training Ms. Jones and reviewing the paperwork on Ms. Jones' first few loans to ensure they were properly prepared.

41. Evidence showed that Defendant paid off client's mortgages using funds deposited into her account by lenders for different clients. For example, there is evidence that Defendant used the money from the Carter closing on October 11, 2006, to pay off the

mortgages of Holmes and Moody, from September 29, 2006 and October 4, 2006, respectively. (Gov. Ex. 11) The government argues that she had to do this because she did not have the funds in her trust account to pay the mortgages. At the withdrawal of plea hearing, Defendant stated that it was merely coincidental that she waited to pay off a prior mortgage until a bank transferred money to her that was supposed to be for another loan. She stated that she did not know about the shortage in her trust account until around December 2006 and admitted she did not reconcile her trust account every quarter.

42. The shortages in the trust account were a result of Defendant moving funds from her trust account to her operating account. During the hearing on the instant motion, Defendant maintained that every transfer from her trust account to her operating account was for firm business. She stated that it was merely coincidental that she transferred money from her trust account to her operating account when she had insufficient funds in her operating account.

43. Defendant stated that she made errors in depositing money into her trust account that was supposed to go into her operating account. Thus, she withdrew those funds. However, she could not explain how that created a shortfall in her trust account.

44. Defendant ended up having a $30,000 shortfall in her trust account, which she attributed to negligence - accounting errors and double payments that amount to over $30,000 in losses over the course of a year. She maintained that none of the transfers were fraudulent and that all of the transfers were for legitimate fees or reimbursements that she had earned. However, the North Carolina State Bar found that Defendant made transfers

of funds from her trust account to her operating account that were not earned fees or reimbursement for expenses paid on behalf of clients – i.e., client funds to which she was not entitled. The North Carolina State Bar examined her trust account in excruciating detail. The North Carolina State Bar audited each closing to determine what money went in and what money went out. Ultimately, the North Carolina State Bar disbarred Defendant because she transferred thousands of dollars to her operating account that she was not entitled to transfer.

45. One example of a fraudulent transfer is April 21, 2006, when Defendant transferred $1,000 from her trust account to pay off a phone bill, to make a payment to the Junior League, and to pay for cable. Defendant Mallard stated that it was just a coincidence that she transferred "fees" of a random amount to her operating account right before she paid bills that she would not have otherwise been able to pay without that money.

46. Defendant testified that she was the only person who had access to her operating account. She stated that she would transfer money from the trust account to the operating account in the middle and end of the month. However, Government's Exhibits 9 and 10 show that funds were transferred at multiple times throughout the month.

47. Numerous inconsistencies arise regarding Defendant's relationship with Jimmy Hitchcock. Defendant's firm processed two closings in which Jimmy Hitchcock received kickbacks. The first was for the sale of his home in July 2006, and the second was for the Piper Glen closing, in which Jimmy Hitchcock's company, Phoenix Resources, received a $79,900 kickback in the form of a check from Defendant's firm.

48. Defendant initially testified that she was not present at the closing of Jimmy Hitchcock's home, then later stated that she did act as a closing agent on that transaction. Then, she stated that <u>might</u> have been present at his closing. Regardless of whether she was actually present, she signed and notarized all of the closing documents for Jimmy Hitchcock's home sale. She later testified that she had not met Jimmy Hitchcock until the Piper Glen closing. Either she falsely notarized the documents outside of Mr. Hitchcock's presence or she lied about never having met him until Piper Glen, both of which are fraud.

49. During the hearing on the instant motion, Defendant admitted to notarizing documents without seeing the person execute his or her signature on numerous occasions.

50. The Piper Glen closing, which Defendant processed, signed and notarized, listed Michael Marshall as the buyer, and fraudulently stated that that home was to be his primary residence. However, Defendant admitted that she had already executed a loan for Mr. Marshall for another property as his primary residence. Under the North Carolina rules governing real estate agents, which defendant was subject to as a licensed North Carolina real estate agent, this was materially fraudulent.

51. Throughout the hearing, Defendant admitted that she acted negligently by accepting documents at face value, signing and notarizing documents without reading or fact-checking, and sending documents directly to the lenders without regards to whether they were genuine. However, she consistently denied *knowing* that she was in fact part of a mortgage fraud cell – a large conspiracy designed to make hundreds of thousands of dollars in fraudulent kickbacks. She denied knowing that the Statons were the ones

benefitting from the straw purchases of the homes or that the Statons owned NP Home Improvements. However, Lisa Staton testified at Defendant's trial that Defendant did in fact know this information.

52. Defendant testified that no one from the Government talked to her to listen to her side of the story. On cross-examination she admitted that she was interviewed by a Special Agent on March 30, 2010.

53. Defendant testified that she did not file her 2006-2008 tax returns until after she was charged in 2012.

54. At the withdrawal of plea hearing, Defendant's testimony changed numerous times based on what document was shown to her.

55. Throughout her testimony, Defendant consistently placed blame on either her firm or staff members.

56. The Court finds as a matter of fact that Defendant was not credible during her testimony, and committed perjury as to her knowledge of the fraudulent nature of the subject real estate transactions and as to the embezzlement of client funds.

## II. Conclusions of Law

Once a guilty plea is entered, a strong presumption exists that the plea is final and binding. United States v. Lambey, 974 F.2d 1389, 1394 (4th Cir. 1992). A defendant bears the heavy burden of showing that "a fair and just reason" exists for withdrawing his or her plea. Id.; United States v. Ubakanma, 215 F.3d 421, 424 (4th Cir. 2000). A "fair and just reason" is one that "essentially challenges the fairness of" a Rule 11 proceeding. Ubakanma, 215 F.3d at 424; Lambey, 974 F.2d at 1394. A fair and just reason for withdraw can also exist if the advice and

counsel of the defendant's attorney falls below an objective standard of reasonableness. See Lambey, 974 F.2d at 1394 (citing United States v. DeFreitas, 865 F.2d 80 (4th Cir. 1989)).

The Fourth Circuit has set forth six non-exclusive factors for district courts to consider when analyzing whether the defendant has met the burden of showing that reasons exist to allow a plea withdrawal. They are:

(1) the existence of credible evidence that the plea was not knowing and voluntary;
(2) credible assertions by the defendant of his legal innocence
(3) any delay between the entry of the plea and the motion to withdraw;
(4) the assistance of competent counsel in connection with the plea;
(5) whether the withdrawal would cause prejudice to the government; and
(6) whether withdrawal would inconvenience the Court and waste judicial resources.

See United States v. Moore, 931 F.2d 245, 248 (4th Cir. 1991). In applying these factors to the facts of the instant case, the Court finds that Defendant has not met her burden of showing that a fair and just reason exists to allow a withdrawal of guilty plea.

First, the Court has not found any credible evidence to suggest that Defendant's plea was not knowing and voluntary. As stated above, Defendant is a well-educated and formerly licensed attorney, licensed real estate agent and notary public. Each of these is a position of trust and carries with it certain fiduciary obligations. She chose not to enter in a plea agreement with the government and then chose to plead guilty in the middle of her trial. The Court gave an extensive colloquy at the Rule 11 hearing in which Defendant stated that she understood the charges against and admitted guilt to all three. She stated under oath that she was not forced to plead guilty by her attorney. In fact, in her correspondence with him, she demonstrated an intimate knowledge of federal sentencing proceedings and of the United States Sentencing Guidelines. As the Court is entitled to rely heavily on the representations that Defendant made at her Rule 11 hearing about the voluntariness of her plea, see United States v. Defusco, 949 F.2d

114, 119 (4th Cir. 1991), combined with Defendant's affirmation of the truthfulness of those statements at the withdrawal of plea hearing, the Court finds that this factor weighs in favor of denying Defendant's motion to withdraw the plea.

Also troubling to the Court is the fact documents show that Defendant contemplated withdrawing her plea as a strategic move as early as September 14, 2012. In an email to her attorney, she refused to sign a plea agreement because

> [t]he Plea Agreement references Rule 11 which has a number of sections giving and taking away my rights to withdraw my plea. Under section (c)(1)(c) of the rule, I am allowed to withdraw the plea after sentencing. *However, under Section IV (14) in the Plea Agreement, I am waiving my rights to withdraw my plea.*

(Gov. Ex. 501.) The Court finds this conduct indicative of a motive to thwart the judicial process and further tends to show the instant motion to withdraw was a strategic move by Defendant to delay justice.

Secondly, the Defendant has not presented the Court with credible assertions of her legal innocence. Defendant's motion to withdraw her plea presented the Court with no factual analysis as to why she is in fact innocent. The mere allegations of innocence in her motion, without any new evidentiary support, are not entitled much weight. See United States v. Wells, 82 F.3d 411 (4th Cir. 1996). Further, Defendant's testimony at the withdrawal of plea hearing was brimming with inconsistencies and verbal gymnastics that made it impossible to follow her interpretation of the events. Examples of her meandering equivocations have already been enumerated in the statement of facts. As stated above, Defendant's testimony at the withdrawal of plea hearing was inconsistent with testimony that the Court found credible during the government's presentation of evidence at trial. Since Defendant has not presented credible

evidence to rebut was what presented at her trial, the Court finds that this factor weighs in favor of denying Defendant's motion.

Thirdly, the extensive delay between Defendant's entry of the plea and motion to withdraw the plea weighs in favor of denying her motion. Defendant waited more than fifteen-months to withdraw her plea without explaining the delay. In <u>Wells</u>, the Fourth Circuit found that a delay of over fifteen weeks was a "substantial delay." <u>Id.</u> Here, Defendant's delay is more than sixty weeks.

Fourth, Defendant was assisted with the plea by competent counsel. As stated above, the standard by which counsel's conduct is measured is one of "objective reasonableness." <u>Lambey</u>, 974 F.2d at 1394. Mr. Winiker is an experienced defense attorney, and evidence on the record shows that he advised Defendant in an objectively reasonable manner. The Court has not found any instance in which Mr. Winiker's conduct suggests that Defendant was ineffectively assisted. Thus, this factor weighs against granting her motion to withdraw the plea.

Fifth, withdrawing the plea would prejudice the Government, which has already expended significant resources in conducting Defendant's trial. Granting this motion would necessitate that the government start the trial over. This would create significant expense on behalf of the taxpayers, as the complexity of the case requires expert witnesses and co-conspirator witnesses transferred from BOP facilities to Mecklenburg County jail. Defendant's delay in moving to withdraw her plea has exacerbated the burden that would be placed on the government if a new trial was to commence. Thus, this factor weighs in favor of denying Defendant's motion.

Finally, and similarly, granting the motion would inconvenience the Court and waste judicial resources.  Defendant elected to go to trial once, and the Government was prepared to try her case to verdict.  **She voluntarily halted the proceedings mid-trial, after she witnessed the evidence against her.**  Different from the vast majority of defendants who plead guilty, she personally heard and observed the witnesses testify against her before she decided to plead guilty.  Notably, she decided to plead straight-up immediately after she heard her best friend's testimony against her, implicating her in the massive fraud and implying knowledge to her fraudulent actions.  It would be a waste of judicial resources to allow Defendant to show up at her sentencing and demand a new trial, especially when she has not provided the court with any new credible evidence as to why she is actually innocent, other than that she was negligent.

For the reasons stated above, the Court finds that all of the <u>Moore</u> factors weigh against granting Defendant's Motion to Withdraw Plea of Guilty.  Therefore, her motion is DENIED.


Signed: December 18, 2014


Frank D. Whitney
Chief United States District Judge